IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NATIONAL CONFERENCE OF          :
BAR EXAMINERS                   :          CIVIL ACTION
                                :
          v.                    :
                                :
MULTISTATE LEGAL STUDIES, INC., :          NO. 04-03282-JF
d/b/a PMBR, *et* al.            :


ADJUDICATION

Fullam, Sr. J.                                    August 22nd, 2006

        This case, involving claims of copyright infringement

and violations of the California Business and Professions Code,

was tried non-jury on February 1, 2, 3 and 6, 2006.  Counsel

submitted lengthy proposed findings of fact and conclusions of

law, accompanied by voluminous exhibits, and closing arguments

were held on April 10, 2006.  My findings and conclusions are

summarized below.

        Plaintiff, the National Conference of Bar Examiners

("NCBE"), develops testing materials used by more than 50

jurisdictions to evaluate applicants seeking bar admission.  The

most widely used of these products is the Multistate Bar

Examination ("MBE"), a 200-question multiple-choice test

administered in February and July each year.  To pass the bar

exam in most jurisdictions, applicants must achieve a minimum

score on both the MBE and on a separate essay portion.  The MBE

covers topics in contracts, criminal law and procedure, constitutional law, real property, evidence, and torts. Each question comprises a brief fact pattern, a lead-in asking the test-taker about a particular legal issue, and four answer choices. Drafting these questions is a lengthy process for which NCBE retains panels of professors, judges, and practitioners. Each MBE contains approximately 60 questions from earlier tests to provide a basis for comparing the performance of applicants on one MBE with that of previous groups. Using these data, plaintiff corrects for variations in the degree of difficulty of the examination when computing individual scores. Questions may appear on several MBEs before being retired.

Because plaintiff reuses many MBE questions, it goes to great lengths to maintain the secrecy of those questions. NCBE submits the MBE to the Register of Copyrights under regulations that exempt secure tests from the deposit requirement. 37 C.F.R. §§ 202.20(b)(4), 202.20(c)(2)(vi); see also National Conference of Bar Examiners v. Multistate Legal Studies, Inc., 692 F.2d 478 (7th Cir. 1982)(upholding the validity of regulations governing registration of secure tests). It also takes steps to enforce this copyright: prohibiting test-takers from discussing or reproducing MBE questions, and resorting to legal action when bar review courses violate these rules. See, e.g., National

Conference of Bar Examiners v. Saccuzzo, No. 03-CV-0737, 2003 WL 21467772 (S.D. Cal. Jun. 10, 2003).  NCBE does release approximately 1100 retired questions, which can be licenced for a fee.

Defendants Robert Feinberg and Dona Zimmerman founded Multistate Legal Studies, Inc. (known as the "Preliminary Multistate Bar Review" or "PMBR") in 1977 to sell MBE test-preparation services.  The company currently offers a variety of programs: a 3-day class, a 6-day class, and a one-on-one tutorial.  These courses provide oral and written instructional materials addressing the substantive law tested on the MBE, test-taking strategies, and practice MBE questions.  PMBR is both popular and lucrative, teaching more than 40,000 students in 2004 (nearly 60% of those taking the MBE) and bringing in more than $16,000,000 in gross revenues that year.  In addition to being the sole owners of PMBR, Mr. Feinberg and Ms. Zimmerman have drawn millions of dollars in salary from the company.

The 3-day course, which is the focus of this litigation, is given in approximately 100 locations before the February administration of the MBE and 150 locations before the July administration.  The average cost to students, as estimated by defendants' expert, was $254.39 in 2001, $275.62 in 2002, $277.34 in 2003, and $304.74 in 2004.  On the first day of the

course, students take a full 200 question simulated MBE, referred to as the "PMBE."  The remaining two days use the PMBE questions to instruct students on substantive law and test-taking techniques.  Students also receive written answer keys to the PMBE with detailed explanations and citations to the source materials used to develop the questions.  Before the inception of this lawsuit, defendants incorporated approximately 50 new questions into each year's 200-question PMBE.  Other course materials were revised less frequently and less extensively.  Mr. Feinberg generates almost all of the PMBE questions and explanatory answer keys himself, relying in part on hornbooks, treatises, reporters, and published cases.  He also admits that he uses the notes of PMBR employees who have taken the MBE in recent years.  PMBR does not retain these notes or any other development materials.

Many PMBR advertisements use "testimonials" from former students emphasizing the similarity between PMBR practice questions and those appearing on the MBE.  Specifically touting the 3-day course, one student praised the quality of PMBR's practice questions, noting that "dozens of nearly identical questions appeared on the actual exam."  Ex. P255.  Another reported that he "breezed through the exam because [he] recognized so many of the questions from PMBR."  Ex. P253.  A

4

third reported that he was "already familiar with many of the questions" before taking the MBE.  Ex. P256.  A fourth exclaimed (in large boldface type) that "It Was Deja Vu All Over Again.  I Was Amazed How Similar The Actual MBE Was To PMBR!"  Ex. P252.

Mr. Feinberg writes other promotional materials himself.  One PMBR brochure explains that:

> PMBR questions cover issues which are **consistently repeated** on the MBE.  (PMBR develops its own questions.  Some other courses overplay the value of released questions.  Since released questions will never be repeated, you will never see them on the MBE – so who needs 'em?).

Ex. P298.  Mr. Feinberg has told students in his 3-day course that they can expect to "recognize many of these similar types of questions on the actual exam,"  Ex. P292, and pointed out particular PMBE questions that were very similar to recent MBE questions.  Predictably, some of those questions are at issue in this suit, e.g. 1544_RLP from the February 2003 MBE and 1327_TOR which appeared on four MBEs from 1992 through 2003.

PMBR is able to expose students to "the latest, the newest questions covering the newest distinctions that were tested [on the MBE]," Ex. P287, because the company's employees sit for nearly every administration of the examination.  After completing the MBE, these employees take notes on the topics covered, and in some instances on the specific facts of questions or their answer choices.  Mr. Feinberg has personally taken the

5

MBE more than 20 times, and Ms. Zimmerman more than a dozen.
Given that these individuals are highly paid to prepare students
to take (and presumably to pass) the bar exam, their failure rate
is strikingly high.  Mr. Feinberg, for example, failed five
consecutive bar examinations in Alaska before barely passing in
February 2004.  Once an applicant passes the bar in a given
jurisdiction, he may not take it there again.  Perhaps even more
startling, Ms. Zimmerman twice failed the Kentucky Bar
Examination despite passing the essay portion, because her scores
on the MBE were so low.  Her testimony that she failed because
the MBE "is quite a difficult examination" speaks poorly of
either her professional qualifications or her credibility as a
witness.

        The events leading to this lawsuit began in Anchorage
in February 2003.  At the time, Alaska was the only jurisdiction
that permitted the use of scratch paper during the MBE.  Even so,
students were strictly prohibited from removing scratch paper or
other exam materials from the testing room.  At the conclusion of
the afternoon MBE session, Mr. Feinberg broke this rule.  As he
was leaving the room, a proctor noticed that he was carrying a
sheet of scratch paper with notes on it.  She stopped him,
confiscated the paper, and filed an Irregularity Report with
NCBE.  While the notes on the paper are brief and somewhat

cryptic, they clearly relate to topics and answer choices of particular MBE questions.  Upon receiving the Alaska Irregularity Report in April 2003, NCBE undertook an extensive review of the defendants' course materials, comparing each PMBE question published from 2001 onward to a database of MBE questions.  After concluding that more than 100 questions had likely been copied, plaintiffs filed this lawsuit.

A plaintiff alleging copyright infringement must prove both ownership of a valid copyright and copying of the original elements of the protected work.  See Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 361 (1991).  As I rejected defendants' attempts to challenge NCBE's copyright in orders of April 13 and July 21, 2005, all that remains is the question of copying.  I find that plaintiff has proven copying both with direct evidence and by demonstrating that there is substantial similarity between the MBE and PMBE questions.

This is the rare case in which there is direct evidence that defendants copied plaintiff's work.  See Rottlund Co. v. Pinnacle Corp., 452 F.3d 726, 732 (8th Cir. 2006) ("Direct evidence of copying is rarely available because it includes evidence such as party admissions, witness accounts of the physical act of copying, and common errors in the works of plaintiffs and the defendants.").  Mr. Feinberg and other PMBR

employees regularly write down information about the fact
patterns, prompts, and answer choices appearing on MBE
examinations that they have taken.  Mr. Feinberg admitted that he
uses these notes when writing PMBE questions.  In order to
facilitate this process, PMBR employees sought out the only
jurisdiction that allowed test-takers to use scratch paper,
taking (and in all but one case failing) the Alaska Bar Exam
eight times from 2001 through 2003.  In February 2003, Mr.
Feinberg was caught leaving the examination room with his scratch
paper.  In addition, PMBR advertisements brag about how close its
questions are to those on the actual MBE, and Mr. Feinberg has
made similar statements.  Finally, many PMBE questions reproduce
MBE questions nearly verbatim, and others contain trivial
variations that suggest awareness of copying.[1]  See M. Kramer
Mfg. Co., Inc. v. Andrews, 783 F.2d 421, 446 (4th Cir. 1986).  I
conclude that defendants willfully copied MBE questions, either
by setting out to do so, or engaging in behavior that was so
certain to lead to copying that intent must be inferred.

---

[1]  To cite just one example, a PMBE question refers to "X-10
gidgets," while the MBE question from which it is copied involves
"X10 widgets."  There could be no more trivial variation.  The
irrelevant PMBE explanation that a "gidget is a synthetic
replication of a widget" confirms awareness of copying.

The substantial similarity between most of the allegedly infringing PMBE questions and copyrighted MBE items bolsters this conclusion.  Because defendants do not dispute that they had access to plaintiff's copyrighted questions, plaintiff will prevail if there is "sufficient similarity between the works so as to conclude that the alleged infringer 'copied' the work," and the similarity relates to the protectable aspects of the allegedly infringed work.  Dam Things from Denmark v. Russ Berrie & Co., 290 F.3d 548, 562 (3d Cir. 2002).

After reviewing each pair of MBE and allegedly-infringing PMBE questions, I conclude that nearly all of the 113 challenged questions are substantially similar to copyrighted MBE questions.[2]  In many instances, evidence of copying practically leaps from the page.  One such egregious example is based on 1792_CNL, which appeared on the July 1999 MBE:

> As Part of the Federal Deficit Eradication Act, Congress imposed a special tax on "all interest in excess of 5% per annum earned by each state of the United States on any of its investments."  This tax is probably

---

[2]  Only a handful of PMBE questions, such as those allegedly based on MBE questions 1270_CNL, 1588_EVD, and 1886_EVD, do not necessarily appear to be copied, either because the MBE questions involve common legal principles presented in a very generalized way or because the similar aspects relate only to the area of law being tested, and not to specific facts or answer choices.

    (A)   constitutional, because it does not discriminate among the several states – it treats all of them in the same manner.

    (B)   constitutional, because it taxes only a proprietary function of the states – it does not tax any of their strictly governmental functions.

    (C)   unconstitutional, because it singles out state governments for special taxation that is not applicable to any other entities or individuals.

    (D)   unconstitutional, because it requires a state government itself to make a tax payment to the United States.

Answer key: C

Question #27 on the 2001 PMBE, repeated as question #142 on the

July 2004 PMBE, reproduced much of this question verbatim:

Congress has passed a new federal statute called the Federal Deficit Eradication Act.  The law imposed a special tax on all interest in excess of 5% per annum earned by each state on any investments made by the respective state(s)

The state of Texas has filed an appropriate action in federal district court challenging the constitutionality of the federal statute.  In all likelihood the court will find the Federal Deficit Eradication Act to be

    (A)   constitutional, because the law does not discriminate among the several states

    (B)   constitutional, because the incidence of the tax is on interest payments from outside investments and does not apply to government functions

    (C)   unconstitutional, because it places a discriminatory burden on state governments

    (D)   unconstitutional, because the tax burden applies to state governmental bodies and not the residents of the state

Answer key: B

This question tests the same legal concept using the same fictitious statute and four virtually identical answer choices in the same order.[3]  As with a number of PMBE questions, the answer key here is incorrect, further undermining Mr. Feinberg's claims that he derived his questions independently from authoritative legal sources.

While many PMBE questions exhibit this degree of similarity, less-than-wholesale reproduction can also provide a sufficient basis to conclude that there was copying.  See Educational Testing Service v. Simon, 95 F. Supp. 2d 1081, 1088 (C.D. Cal. 1999)("[I]mmaterial variations do not alter the conclusion that infringing material is substantially similar to copyrighted material.").  Question #120 on the 2002/2003 PMBE, repeated as question #174 on the July 2004 PMBE and #20 on the 2005 PMBE, involves all of the same material facts as MBE question 1672_TOR, which appeared in July of 2001.  The MBE question reads in relevant part:

> Agent arranged a dinner meeting with Customer, a prospective
> stockholder.  During dinner, Agent made several false and
> misleading statements to Customer regarding the financial

---

[3]  Mr. Feinberg testified that he was "very surprised" at the similarity between these two questions even though he recalled seeing the MBE question when taking the examination and writing the PMBE question afterwards.  Tr. 2/3/06 at 80-81.

soundness of Company.  Waiter, who was serving the table next to Agent and Customer, overheard the statements.  Based on those statements, Waiter purchased a substantial number of shares of Company stock.  Within weeks after Waiter's purchase, Company filed for bankruptcy and Waiter lost his entire investment.  In a suit by Waiter against Agent to recover for his loss, will Waiter prevail?

(A)  Yes, because Waiter reasonably relied on the statements made by Agent.

(B)  Yes, because Agent should have foreseen that Waiter would hear the false statements.

(C)  No, because Agent was not attempting to induce Waiter to purchase any Company stock.

(D)  No, because investing in newly issued stock is too speculative.

Answer key: C

The PMBE question also involves a waiter who overhears fraudulent insider information not intended for his ears, invests his money based on this information, loses it, and sues the one who made the statements.  Two of the answer choices are also nearly identical:

Bilko was an investment swindler who ran a Ponzi scheme. One evening he took a group of unwitting investors to dinner hoping to convince them to invest in a new business venture. At the restaurant Bilko falsely told the gathering that his company's stock price would appreciate 200% within three months.  Dupe, a waiter at the restaurant, overheard Bilko's presentation and decided to invest in the enterprise himself.  Thereafter, Dupe invested $10,000, his entire life savings, in Bilko's business venture.  Two months later Bilko's company became insolvent and filed for bankruptcy. If Dupe sues Bilko for fraud seeking to recover damages for his investment loss, will he prevail?

(A)   Yes, because Bilko should have been aware that other
      people may have overheard his false statements.

(B)   Yes, because Bilko provided false information which was
      relied on by Dupe.

(C)   No, because Bilko did not intend to induce Dupe to act
      in reliance and invest in his investment scheme.

(D)   No, because Bilko did not direct his statements to Dupe
      who happened to be eavesdropping on the conversation.

Answer key: C

While defendants included some original language and factual

embellishments, they clearly copied the question from the one

appearing on the MBE.

In all, defendants copied well over 100 PMBE questions

from the MBE, in many cases duplicating passages nearly verbatim

or reproducing labyrinthine fact patterns turn by turn.

Having determined that there was copying, I now turn to

whether the copied elements are subject to copyright protection.

MBE questions may reflect original expression in their wording,

particularized facts, and answer choices.  Defendants argue that

they should be afforded only limited protection because they test

established legal rules within a relatively narrow set of formal

constraints.  This is a fundamental misreading of Educational

Testing Services v. Katzman, 793 F.2d 533, 542 (3d Cir. 1986),

which recognized that there is protectable expression even in a

multiple choice question designed to test knowledge of basic

mathematical concepts, such as square roots and fractions.  <u>See</u> <u>also</u> <u>Ass'n of Am. Med. Colls. v. Mikaelian</u>, 471 F. Supp. 144, 150 (E.D. Pa. 1983).  Teaching the legal principles tested on the MBE is permissible.  Doing so using the same fact patterns, prompts, and answer-choice combinations found in MBE questions is not.

MBE questions based on published cases or newspaper articles are protectable to the extent that they include material alterations in the facts, new legal issues, or original answer choices.  For example, question 1033_CRM, which appeared on the February 2001 MBE, drew on a 1993 New York Times article reporting that a court clerk had been charged with murder after smuggling a firearm into the courthouse for her boyfriend, who used it to kill a police officer.  <u>See</u> Joseph F. Sullivan, <u>Clerk</u> <u>Accused of Smuggling Gun in Courthouse Killing</u>, N.Y. Times, June 5, 1993, at A11.  Inspired by this article, the MBE drafters developed a question designed to test the defenses of duress, necessity, and insufficient mens rea.  In so doing, they added two key facts not appearing in the article: that the gunman told the clerk that he wanted her to smuggle the gun so that his probation officer would not discover it, and that he threatened to kidnap her children if she refused to cooperate.  The question's focus on the clerk's best defense and the four specific answer choices also reflect creative expression.  A PMBE

14

question from 2003/2004 copied the additional facts, prompt, and three of the same answer choices, all of which are protected by plaintiff's copyright.

In other instances, the creative expression is embodied in the answer choices, rather than in the fact patterns alone. The fact pattern in question 1999A_EVD, for example, is so general that it would not, on its own, qualify for copyright protection:

> In a prosecution for murder, the judge has discretion to DENY which of the following requests made by the prosecution?

The extremely open ended nature of the question, however, increases the degree of creativity involved in drafting the one correct and three incorrect answer choices.  Question #19 from the 2003/2004 PMBE would not violate plaintiff's copyright simply because the fact pattern is materially similar, however it also uses four substantively identical answer choices, and this wholesale reproduction of a copyrighted question is not permitted.

I find defendants' claims of independent creation to be wholly incredible.  The "source binders" submitted are simply post hoc efforts to identify sources that could, theoretically, have been used.  Even so, many of the "sources" simply provide support for the legal principle being tested, lacking anything

related to the creative choices made by plaintiff in drafting MBE
questions.  Notably, even when plaintiff *was* inspired by a case
or newspaper article, defendants' "source binders" often omit
these clearly related materials.  In addition, defendants did not
draft any new PMBE questions for 18 months after agreeing not to
take the MBE while this suit was pending.  Defendants also failed
to provide a credible legitimate explanation for the striking
similarity in the wording of many PMBE and MBE questions.

     I also reject defendants' attempt to invoke laches and
estoppel.  Their contention that plaintiff's failure to object to
earlier PMBE questions that may have violated NCBE copyrights
holds no merit.  The issue in this case is whether 113 specific
questions are infringing, and defendants could not reasonably
have taken plaintiff's silence after publication of other
questions as general permission to engage in copyright
infringement.  All but thirteen of the infringing questions were
first published by PMBR within the statutory limitations period,
creating a strong inference that plaintiff timely asserted its
claim.[4]  Seven of these thirteen were first published in 2001,

---

[4]  While defendant's proposed findings of fact suggests that
there are 26 such questions, it identifies only 21. Six of those
questions are not currently being challenged by plaintiff, and I
conclude that two others, 1588_EVD and 1886_EVD, are not similar
enough to suggest copying.

and thus may also have been challenged within the limitations period. To the extent that challenged questions first appeared prior to the limitations period, I find that plaintiffs did not have actual knowledge of the infringement until October of 2003 and that they were not on constructive notice before that date. Plaintiff's earlier copyright infringement suits against defendants[5] did not give rise to a general duty to police all PMBR materials. Cf. Kepner-Tregoe, Inc. v. Executive Development, Inc., 79 F. Supp. 2d 474, 487-89 (D.N.J. 1999) (imposing a duty to police when plaintiff had previously sued defendant over the *same* copyright and had reason to believe that the infringement had been continuous since that time). Defendants also argue constructive notice based on reviews of PMBR materials by an external consulting firm in 1996, 1998, and 2001. Only the 2001 review might potentially have discovered any of the questions in-suit, and it did *not* reveal suspect

-------------------

[5] In 1978, NCBE sued PMBR for copyright infringement, and unfair competition and deceptive trade practices. Plaintiff dropped its copyright claim after concluding that the alleged infringement had ceased, and lost on its other claim. National Conference of Bar Examiners v. Multistate Legal Studies, Inc., 692 F.2d 478 (7th Cir. 1982). In 1990, NCBE sued PMBR in this District, alleging copyright infringement. The parties entered into a court-approved settlement later that year, and spent the next five years squabbling over issues relating to that agreement. See National Conference of Bar Examiners v. Multistate Legal Studies, Inc., Civil Action No. 90-1471 (E.D. Pa.)(Weiner, J.).

questions.  Plaintiff hired a well-respected consulting firm to do these reviews and reasonably relied on the results.  I conclude that these reviews in fact demonstrate a good-faith effort on the part of plaintiffs to detect infringement. Plaintiffs waited less than one year between discovering the infringement and filing suit, well within permissible bounds.

Defendants infringed plaintiff's copyright, and damages must now be determined.  NCBE has elected to pursue actual damages plus PMBR's profits, rather than statutory damages, pursuant to 17 U.S.C. § 504(a).  I find that the evidence supports awarding both actual damages and apportionment of PMBR's revenues.

Actual damages may include both the direct expenses resulting from the copyright infringement and the loss in the fair market value of the copyright.  I conclude that the July 2005 MBE had to be reprinted at a cost of $59,000 because defendants' copyright infringement had compromised the initial version.  There was no evidence of other expenses or of any loss in the market for plaintiff's copyrighted materials.  I also decline plaintiff's invitation to award lost licensing fees, which are appropriate when copyright infringement substitutes for or interferes with a hypothetical contract between the parties. See, e.g., Davis v. The Gap, Inc., 246 F.3d 152, 166-67 (2d Cir.

18

2001).  Here, I find that there could not have been such a
contract: there is no fair market value for the infringed
questions, because to release current MBE questions is to
undermine the validity of the entire examination; there is also
no evidence to suggest that defendants would have licensed
released questions, because such questions do not provide the
crucial information defendants sought – previews of upcoming
tests.  Since plaintiff lost no hypothetical royalties, I cannot
award actual damages in compensation.  I can and will, however,
factor the uniquely proprietary nature of the infringed questions
into apportionment of defendants' profits.

In order to recover lost profits, the owner of an
infringed copyright "is required to present proof only of the
infringer's gross revenue."  17 U.S.C. § 504(b).  It is the
infringer's burden "to prove his or her deductible expenses and
the elements of profit attributable to factors other than the
copyrighted work."  Id.  NCBE met its burden by proving the gross
revenues generated by PMBR's 3-day course.  Because defendants
did not introduce any evidence of expenses or other factors to
which profit should be attributed, I use gross revenues as the
measure of defendants' profit.  Relying on the average cost per
student, supplied by defendants' expert, and the number of
students who took the course, I conclude that defendants'

19

revenues from the 3-day course from July 2001 through 2005 were
$35,708,361.[6]  These revenues will be apportioned, and damages
awarded only to the extent that they are attributable to the
infringement.  Doing so does not involve a mathematical formula,
but rather an assessment of the relative importance of the
infringing questions.  See, e.g., Bruce v. Weekly World News,
Inc., 310 F.3d 25, 31-32 (1st Cir. 2002); Blackman v. Hustler
Magazine, Inc., 800 F.2d 1160, 1164-65 (D.C. Cir. 1986).

       In determining how much of defendants' revenues to
award, I take into account PMBR's advertisements and excerpts
from Mr. Feinberg's lectures.  The heavy emphasis on similarity
between PMBE questions and MBE questions suggests that this is a
major selling-point for the company.  It is not difficult to
understand why this might be the case, as PMBR's potential
customers are almost all already enrolled in a general bar-review
course that includes MBE preparation.  Some students may enroll

---

       [6] While the average cost per student undoubtedly rose again
in 2005, it was plaintiff's burden to introduce such evidence, so
I have not accounted for any increase in calculating 2005
revenues.

       2001: 19,503 students x $254.39 = $ 4,961,368
       2002: 24,853 students x $275.62 = $ 6,849,984
       2003: 25,150 students x $277.34 = $ 6,975,101
       2004: 26,497 students x $304.74 = $ 8,074,969
       2005: 29,032 students x $304.74 = $ 8,847,212
       Total                             $35,708,361

in PMBR simply to get extra practice or to access the particular expertise of its instructors, but there can be no question that the high quality of PMBR questions is a major attraction.  While this quality may be due in part to the ability of defendants to generate realistic practice questions, the evidence in this case reveals that it is largely a result of blatant copyright infringement.  On the other hand, students taking the 3-day course also receive workbooks containing 2000 other practice questions, substantive law outlines, and study aids.  Still, the PMBE is clearly the heart of the course.  Because question similarity is a major draw, and because infringing questions made up close to 40% of the PMBE from 2003 through 2005 (though a substantially lower percentage in 2001 and 2002), I conclude that attributing one-third of defendants' revenues to the infringing questions is justified.  Plaintiffs will be awarded $11,902,787.

I find that injunctive relief is also warranted, as copyright liability has been established, and there is a real threat of future infringement.  17 U.S.C. § 502.  Defendants will be enjoined from copying, duplicating, distributing, selling, publishing, reproducing, renting, leasing, offering or otherwise transferring or communicating in any manner, orally or in written, printed, photographic or other form, including any communication in any class or other presentation, any questions

obtained directly from any of NCBE's copyrighted secure tests.
See Katzman, 793 F.2d at 544-545.

I also find that defendants violated the California
Business and Professions Code by intentionally reproducing MBE
questions, thereby subverting a licensing examination taken by
thousands of applicants seeking admission to the California Bar
each year.  See Cal. Bus. & Prof. Code §§ 17200-209; 123-123.5.
This statute entitles plaintiff to restitution and injunctive
relief.  I conclude that the damages already awarded provide full
restitution.  Because of the likelihood of future violations,
defendants, their employees, and agents will be enjoined from
taking any Multistate Bar Examination for any purpose other than
to obtain bar admission in the jurisdiction in which the
examination is being given.

Guided by the factors articulated by our Court of
Appeals, I conclude that an award of reasonable attorney's fees
and costs is justified.  See Lowe v. Loud Records, 126 Fed. Appx.
545, 547 (3d Cir. 2005).  Defendants' willful and egregious
copyright infringement harmed the public as well as plaintiffs.
States have a compelling interest in regulating admission to the
bar both to maintain the integrity of the legal system and to
protect the safety of their citizens.  By exposing its students
to questions likely to appear on the MBE, PMBR undermined the

integrity of the bar examination, possibly causing the admission of unqualified applicants.  That the victims of this harm are impossible to identify and the injury impossible to quantify underscores the need to deter would-be copyright infringers.

An Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NATIONAL CONFERENCE OF           :
BAR EXAMINERS                    :          CIVIL ACTION
                                 :
          v.                     :
                                 :
MULTISTATE LEGAL STUDIES, INC., :          NO. 04-03282-JF
d/b/a PMBR, *et* al.             :

ORDER

AND NOW, this 22nd day of August 2006, IT IS ORDERED
that:

1.   JUDGMENT is ENTERED in favor of the plaintiff,
National Conference of Bar Examiners, and against the defendants,
Multistate Legal Studies, Inc., Robert Feinberg, and Dona
Zimmerman jointly and severally, in the sum of $11,961,787.

2.   Defendants are enjoined from copying, duplicating,
distributing, selling, publishing, reproducing, renting, leasing,
offering or otherwise transferring or communicating in any
manner, orally or in written, printed, photographic or other
form, including any communication in any class or other
presentation, any questions obtained directly from any of NCBE's
copyrighted secure tests.

3.   Defendants, their employees, and agents are
enjoined from taking any Multistate Bar Examination for any

purpose other than to obtain bar admission in the jurisdiction in which the examination is being given.

   4. Plaintiff may submit an application for attorney's fees, costs, and prejudgment interest within 20 days, and defendants may respond within 10 days thereafter.


        BY THE COURT:


        /s/ John P. Fullam
        John P. Fullam,  Sr. J.